IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | |
|---|---|
| MARIE DICKERSON, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 2:17-cv-508-TFM |
| | ) |
| STANDARD INSURANCE COMPANY, | ) |
| | ) |
| Defendant. | ) |

## COMPLAINT

Plaintiff Marie Dickerson ("Plaintiff") brings this action seeking damages for breach of contract and bad faith for Defendant Standard Insurance Company ("Standard") for its wrongful failure to pay Plaintiff's claim for disability insurance benefits under a group policy provided through her former employment with Auburn University, a State of Alabama educational institution. In support of the relief requested herein, Plaintiff alleges the following upon personal knowledge as to herself and as to all other matters upon information and belief based upon, *inter alia*, the investigation made by and through her attorneys:

## INTRODUCTORY STATEMENT

1. This action arises out of Standard's wrongful failure to investigate and pay Plaintiff's claim for long term disability benefits under a group insurance contract provided to Plaintiff through her former employer Auburn University. Plaintiff seeks compensatory and punitive damages for this failure and breach of terms, together with any other relief to which she may be entitled under law.

2. Plaintiff's entitlement to her insurance benefit is based on the conditions documented in her medical records before Standard and other supporting evidence.

3. Plaintiff's physical limitations include significant difficulties with lifting and carrying, prolonged sitting or standing, walking, pushing/pulling, bending/stooping, and intensive difficulties with stamina and concentration due to pain and the effects of her medications. She is also limited significantly by her pain and necessary medications.

## JURISDICTION

4. Jurisdiction is appropriate under 28 U.S.C. § 1332 in that the matter in controversy exceeds the sum of $75,000, exclusive of interest and costs, and diversity of citizenship exists between the parties.

5.    Venue is proper in that the Plaintiff resides in this District and Defendant does business in this District.

## PARTIES

6.    Plaintiff Marie Dickerson is a resident citizen of Macon County, Alabama and is an insured under the policy described in this Complaint as a former employee of Auburn University.

7.    The Standard Life Insurance Company ("Standard") is a foreign corporation that does business by agent or otherwise in all counties in Alabama, including Macon County.

8.    Standard is the insurance company responsible for the benefit at issue pursuant to the terms of the relevant contract.

9.    One of Standard's designated agents for service of process is:

CT Corporation System
2 North Jackson Street, Suite 650
Montgomery, AL 36104

## THE POLICY

10.   The policy at issue in this case is a group policy issued by Standard to Auburn University for the benefit of its employees such as Plaintiff.

11. This policy, which provides a long-term disability benefit in the event the insured can no longer work, was purchased by Auburn University to confer a benefit upon Plaintiff and other employees.

12. Under the terms of this policy, Plaintiff is "disabled" as defined by policy terms.

## STANDARD'S LIABILITY

13. Ms. Dickerson graduated from Auburn University in 1977 with a degree in family and child services, as well as psychology. She then obtained a Master's Degree which she began at Tuskegee University and concluded in 1984 at Atlanta University. She began working for Macon County Juvenile Services for the first leg of what has been a remarkable career counseling and working with troubled youths.

14. Ms. Dickerson started working for the Auburn University Psychology Department in 2008, again as a mental health therapist.

15. Not long after she began working, she began experiencing pain in her leg while walking up a significant hill at Mt. Meigs Correctional Facility (a youth detention center). Her leg also went numb. She learned when she saw a doctor later that her pain and leg numbness

occurred because she had developed spinal stenosis and had two degenerative discs and pinched nerves in her back.

16. For the next 8 years, Ms. Dickenson dealt with this pain as best as she could, but as one would expect with any *degenerative* condition, it grew worse with time.

17. In 2014, things changed substantially for the worse. That year, she began experiencing swelling in her knees, legs and around her groin area. Her pain has also significantly increased.

18. That December, however, her back finally and completely failed when she stood up from a desk. She was unable to continue working that day because of the pain and saw her doctor, who ordered an MRI.

19. The MRI revealed *two more* degenerative discs.

20. She also learned she had osteoarthritis.

21. The increased level of pain she was now experiencing was from a combination of having a slipped disc, osteoarthritis, and inflammation.

22. She was given an epidural to control the pain during her visit, but still she was unable to walk the next morning.

23. Since then she has essentially fallen apart. She cannot sit for any appreciable length of time without having to reposition, and when she does stand, she was to worry about her ability to control her legs because they go numb. She further is in constant pain, so much so that she has looked to any solution no matter how extreme to provide relief.

24. Her days now consist of significant rest periods, much of which is bedrest.

25. Her pain warrants use of hydrocodone at times, which of course causes sleepiness and significant decline in cognitive function. She also takes a muscle relaxer, which blurs her vision. She rarely is able to leave the house, and when she does, it is an adventure. Her husband usually has to drive her around and, even then, the car rides are painful and draining for her.

26. The records from her attending physician, Dr. Dawson, confirm her to be in constant pain and to be experiencing significant physical difficulties. In a September 14, 2016 record, Dr. Dawson reports:

```
Assessments
1. Spinal stenosis, lumbar region - M48.06 (Primary)
2. Spondylolysis, lumbar region - M43.06
3. Other idiopathic scoliosis, thoracolumbar region - M41.25
4. Long term (current) use of opiate analgesic - Z79.891
5. Spondylosis without myelopathy or radiculopathy, lumbar region -
M47.816
6. Bilateral primary osteoarthritis of hip - M16.0

I will order her a lumbar spinal orthosis and a new cane due to her cane
exhibiting wear and tear. I complete paperwork for her today.
```

27. In a December 20, 2016 record, Dr. Dawson describes her pain as follows:

```
Pain Management:
   The patient is complaining of pain located in the back, leg and knee
pain.
   Compared to the last visit the pain is worse.
   The pain is described as sharp and shooting, throbbing, numbness
and tingling, dull soreness.
   The pain radiates down legs.
   The severity of the pain today is 8/10.
   The timing of the pain is continuous.
   The pain is associated with back stiffness, knee stiffness and poor
sleep.
   The pain is improved by Duexis 800mg/26/6mg.
   The pain is aggravated by prolonged sitting, standing and walking
and cold weather and cold temperatures.
```

28. As to Mrs. Dickerson's lack of functional capability, Dr. Dawson assesses her to be incapable of sitting for more than a total of 2 hours per day, and no longer than 30 minutes at a time.

29. Dr. Dawson has also made other findings as well, all of which are consistent with Mrs. Dickerson being permanently and totally disabled:

- 7 -

6. Does the **patient require bedrest** during a normal workday? Yes ✓ No ___

   If yes, for approximately how many hours per day? 2 hrs

7. Does the **patient have problems with stamina and endurance which would require** him/her to rest more than the one 30-minute break and two 15-minute breaks normally allowed?

   Yes ✓ If yes, how much rest? 3 hour for every 2 hour of work

   No ___

8. Do the **patient's subjective complaints seem reasonable** in view of your observations and diagnoses? Yes ✓ No ___

9. Could the **patient be reasonably expected to be reliable in attending an eight (8) hour a day, 40 hour work week** in view of the degree of pain, fatigue or other limitations he/she experiences?

   Yes ___  No ✓

10. **How severe is the pain** suffered by the patient?

    Extreme ✓   Severe ___   Moderately Severe ___   Moderate ___   Mild ___

11. Is it reasonable that the **patient's medical condition, pain or medication would cause lapses in concentration or memory** on a regular basis to the extent that your patient could not attend to a task or be reliable in following work instructions?

    Yes ✓   No ___

    If yes, how often would his/her condition reasonably causes such lapses in concentration or memory?

    ___ daily for several hours a day
    ✓ several hours 3 or more days a week
    ___ other: _____

30. Mrs. Dickerson has also been found unable to work by a vocationalist who has reviewed her records and assessments.

31. After The Standard initially terminated Mrs. Dickerson's claim for benefits, Mrs. Dickerson presented the evidence above in accordance with the policy's "appeal" provision.

32. The Standard then issued its final decision under the policy that Mrs. Dickerson, although initially found to be disabled when she first applied, was not entitled to benefits any longer.

33. The Standard's final denial letter, however, betrayed several glaring investigational deficiencies when it stated the reasons for the finality of its decision.

34. After receipt of the decision, Mrs. Dickerson, through counsel, presented these problems to The Standard to address or for response. The questions raised with The Standard were as follows: (i) Did The Standard's physician consultant make any attempt to speak with Ms. Dickerson's treating physicians to ascertain the reason for the discrepancy between opinions given and the office notes provided? If no contact was made, why not?; (ii) Since Ms. Dickerson's physical abilities are at issue according to The Standard, why didn't The Standard have Ms. Dickerson submit to a medical examination, a tool plainly before The Standard especially when there are perceived conflicts in medical evidence?; (iii) Related to the question above, why did The Standard elect to rely on a "paper review" instead of an actual

physical examination, whether through consideration given to Ms. Dickerson's treating physicians, or through The Standard's scheduling of an independent medical examination, especially when pain was such a big part of Mrs. Dickerson's condition?; and (iv) How and why did The Standard see fit to believe that Mrs. Dickerson's significant effort to continue working paradoxically reflect a perceived sudden malingering by her as of December 2015?

35. Standard responded that it considered the matter, and Mrs. Dickerson's "record," closed, and provided no detail or reply to these issues, nor did it undertake to address them as glaring deficiencies.

36. Standard's reference to a "record" is telling, because it reveals the reason Standard did not pursue a substantive investigation of Mrs. Dickerson's claim is because it believed her claim to be governed by ERISA – where claims are decided based on an ERISA "administrative record" --- and therefore shielded from possible court scrutiny.

37. In addition to the lack of any true investigation of this claim, The Standard also failed to give proper consideration to the evidence before it, including specifically the records and assessments described above in the foregoing paragraphs

## COUNT ONE
### Breach of Contract

40. The Plaintiff incorporates by reference all previous paragraphs of this Complaint as if set out in full.

41. The Plaintiff is a plan participant of the long-term disability policy obtained through her employment with Auburn University's Psychology Department.

42. Under the terms of the policy, the Defendant contracted to provide the Plaintiff with long-term disability benefits should the Plaintiff become unable to work as provided under policy terms.

43. Under the terms of the policy, the Defendant was required to pay the Plaintiff monthly disability benefits, subject to an elimination period, once the Plaintiff became disabled.

44. The Defendant has breached the contractual obligations set forth in the policy issued to the Plaintiff by wrongfully refusing to pay disability benefits to the Plaintiff.

45. The Plaintiff's insurance contract with the Defendant pertains to matters of mental solicitude, as it was intended to provide financial support for the Plaintiff in the event that she became physically unable to work, and it was intended to provide such support up until the time her disability ended.

46. The Plaintiff has suffered mental anguish as a result of this breach.

47. As a direct and proximate result of the Defendant's conduct and breach of its contractual obligations, the Plaintiff has suffered damages under the policy in an amount to be determined according to proof at the time of trial.

WHEREFORE the premises considered, the Plaintiff demands judgment against the Defendant as follows:

(a) For all such past due benefits the Plaintiff is entitled to receive;

(b) For interest on all past due benefits;

(c) For prompt reinstatement of the Plaintiff's benefits claim;

(d)   For mental anguish damages for breach that pertained to the mental solicitude of the Plaintiff and was reasonably foreseen to cause such damages in a sum to be determined by a jury or this Court;

(e)   For costs of this action and case expenses; and

(f)   For such other equitable and further relief as the Court may deem just and proper.

## COUNT TWO
## Bad Faith

48.   The Plaintiff incorporates by reference all previous paragraphs of this Complaint as if set out in full.

49.   The policy was underwritten and/or insured by the Defendant who was solely responsible for claims operations, communications, and decisions.

50.   The Defendant was informed by the Plaintiff and her doctor(s) of the Plaintiff's disabling conditions.

51.   The policy contains an express or implied covenant by which the Defendant owed a duty to act in good faith and to deal fairly with the Plaintiff. The Defendant has refused to provide disability benefits to the

Plaintiff, thereby breaching that express or implied covenant in one or more of the following ways, among others:

 a. by intentionally refusing to pay a lawful and proper disability claim made by the Plaintiff;

 b. by wrongfully refusing to pay the Plaintiff's disability claim with actual knowledge of the absence of a reasonably legitimate or arguable reason for denial of the Plaintiff's claim to benefits, at a time when the Defendant knew or reasonably should have known that the Plaintiff was entitled to those benefits;

 c. by intentionally failing to determine whether there was a legitimate or arguable reason to refuse to pay the Plaintiff's claim to benefits;

 d. by creating its own debatable reasons for denying the Plaintiff's claim;

 e. by wrongfully and in bad faith interpreting the policy and the factual circumstances of the Plaintiff's claim for benefits to resolve ambiguities and uncertainties against the Plaintiff and in favor of its own interest;

  f. by misconstruing policy provisions, terms, and applicability;

  g. by wrongfully denying the Plaintiff's claim for benefits by intentionally choosing to ignore the evidence submitted by the Plaintiff in support of her disability;

  h. by failing to conduct a fair investigation and review of the Plaintiff's claim for benefits; and

  i. by interposing and continually asserting meritless reasons for denying Plaintiff's claim for benefits.

52. As a proximate result of the above unreasonable and bad faith conduct of the Defendant, the Plaintiff has suffered, and will continue to suffer in the future, damages under the policy, plus interest, and other economic and consequential damages.

53. As a further proximate result of the above unreasonable and bad faith conduct of the Defendant, the Plaintiff has suffered anxiety, worry, mental and emotional distress, all to the Plaintiff's general damage in a sum to be determined by a jury or this Court.

54. The Defendant conducted itself in a willful and conscious disregard of the rights of the Plaintiff, or subjected the Plaintiff to cruel

and unjust hardship in conscious disregard of the Plaintiff's rights, or intentionally misrepresented or deceived the Plaintiff regarding material facts known to the Defendant with the intention to deprive the Plaintiff of property, legal rights, or otherwise cause injury, such as to constitute bad faith or malice, thus entitling the Plaintiff to punitive damages in an amount appropriate to punish or set an example of the Defendant.

55.   The Plaintiff claims punitive damages.

WHEREFORE the premises considered, the Plaintiff demands judgment against the Defendant as follows:

a.   For all such past due benefits the Plaintiff is entitled to receive;

b.   For interest on all past due benefits;

c.   For prompt reinstatement of the Plaintiff's benefit claim;

d.   For mental anguish damages suffered by the Plaintiff as the result of the Defendant's actions;

e.   For punitive damages for the above described wrongful conduct of the Defendant which involves an intentional or

deliberate engagement of bad faith regarding the Plaintiff and her rights under the policy in question;

f.  For costs of this action and case expenses; and

g.  For such equitable and further relief as the court may deem just and proper.

**\*\*\* Plaintiff hereby demands a trial by struck jury \*\*\***

Respectfully submitted,

M. Clayborn Williams
(ASB-9101-A43M)

David P. Martin
(ASB-3500-m68d)

**The Martin Law Group, LLC
Attorneys for Plaintiff**
P.O. Box 20087
Tuscaloosa, AL 35402-0087
Phone (205) 343-1771
Facsimile (205) 343-1781
clay@erisacase.com
david@erisacase.com

## Plaintiff's Address:

Marie Dickerson
c/o The Martin Law Group, LLC
P.O. Box 20087
Tuscaloosa, AL 35402

## Defendants' Address:

Standard Insurance Company
900 SW Fifth Avenue
Portland, OR 97204-1235